I would have thought attorneys of your caliber would have attracted a crowded courtroom. Good morning, gentlemen. We will now hear argument in U.S. v. Terrence Williams. Mr. O'Connell. My name is Timothy O'Connell. I represent Terrence Williams, who is the appellant in this matter, and I have requested a two-minute time in reserve for rebuttal. Granted. This case, as the court may be somewhat familiar, resulted from an indictment filed in December of 2005 charging a multi-state prostitution enterprise involving my client and 15 others. Ultimately, my client and one other went to trial, the rest having plea agreements and having been sentenced. The principal charges against my client were conspiracy, interstate travel, and furtherance of prostitution. And the two principal charges here, sex trafficking in violation of 18 U.S.C. 1591 and interstate transportation of a minor in violation of 18 2324. Now, the evidence presented at trial basically involved, for the most part, activities at a place called the Gables Truck Stop outside of Harrisburg in the early part of 2005. Now, rather than go through the issues that I've presented in my brief in seriatim, what I would like to do with my argument time here is focus on a couple of issues, the resolution of which I think will assist the court in resolving the issues that were actually raised in the brief. The first that I would like to address is the nature of this prostitution business for which evidence came out at trial. Now, the principal witness for the government was a co-defendant by the name of Wayne Banks, who was probably the first one arrested who was a co-defendant in this matter. And he described the business of prostitution in this case. And he called it the game. The players in this game are the pimps and the prostitutes. And the most important fact is that the women who participate in this game do so because they choose to do so. Now, you made that argument and I think the arguments that I believe you're going to make in terms of they entered voluntarily, none of them experienced prostitutes, although I'm not sure that's true with Carrie Hudson. And they got paid money, which is what they wanted. You made these arguments to the jury. And the jury rejected the argument. And we now have a very deferential standard of review to apply to the verdict, do we not? Well, I suppose that is so. But it does still, it's a less deferential standard with regard to the enhancements that were applied, which are abuse of discretion standards, of course. Sure. I mean, the nature of the conspiracy, the nature of the, as you put it, the prostitution business, you're looking for words in the light most favorable to you, you know, calling it a game. Banks also called it a partnership. But he called things of that nature that don't help your argument. And the jury decided them against you. So I don't know if you should spend your time on effectively a sufficiency of the evidence point when you've got, I think, 14 points you've raised in your brief, some of them going to sufficiency. Well. I speak only for myself, but this is. Certainly. I'm not sure that the jury was actually asked to pass on the willingness issue. And this goes into another issue that we've raised in the brief, which is the instruction on the 1591 charge. And in that instruction. I swear you've got a good issue, in my judgment. In that instruction, the jury was instructed, or that is, I think, misinstructed, with regard to the elements of the offense. And what they should have been instructed to consider is whether a person was caused to have commercial sex by forced fraud or coercion, or if the person was under 18 and caused to have commercial sex. However, they weren't properly instructed on the second basis of possible conviction, which is that the person be under 18 and caused to have commercial sex. They were only told that the person had to be under 18. It's a complicated. You really, your issue on the instructions goes to the elements for purposes of sentencing, the maximum sentence, and the elements with reference to conviction. Again, speaking for myself, I think you have a better argument on the first, because the second, the evidence was pretty strong here. You would have to, this is plain error review. You would have to show, you know, almost a miscarriage of justice as to the failure, and it was a failure here, to give you the second prong of the second prong for purposes of the conviction. I understand, and I think the problem is this. The court below purported to give two alternative bases for conviction, forced fraud or coercion, or under 18, which was incomplete in and of itself. The jury, having heard that they have two different bases for conviction, comes back with a single verdict slip, which doesn't contain any alternatives. It just says guilty or not guilty, so we don't know exactly what it is they premised. We don't know which of the two, but there's sufficient evidence for either one. Well, there isn't, because... Well, Klempner was under 18. She was under 18. And there was ample evidence in the record of force in the conspiracy, coercion, if not force. Well, the problem is, are we attributing coercion used by co-defendants to this defendant? And if we are... Well, we attributed coercion in count one as to a different crime, coercion and enticement. Correct. That's a different standard than the one for count eight. That's correct. That's correct. But with regard to the instruction in count eight, they were never instructed that either coercion, force, fraud, or coercion were used, or she was under 18. But never the added element that she'd be caused to have commercial sex, just be under 18. So they come back... But what I said earlier, caused to have commercial sex, if you look at the evidence in this case, I don't know how you can show a miscarriage of justice on that prong. I think you're much better off arguing that because of the failures here, the inconsistencies here, between the indictment, the instructions, the verdict sheet, the remarks at sentencing, we don't know. We cannot say that the jury beyond a reasonable doubt found one rather than the other for purposes of maximum sentencing. Now, I can't make it any clearer than that. If you don't want to address that, you're right, but that's where I think your stronger argument is. Well... That this should be a 40-year max, not a 45. Not a life. Not a life. I think the court has made my point as well as it can be made on that issue. Okay. I think in a case like this where the maximum sentence is affected by a factual issue or determination, that determination must be made by the jury. They weren't given that opportunity. And so the court cannot take it upon itself to decide that it's going to impose a maximum sentence in an area where the jury clearly has to make that determination. I would like to focus at this time then a little bit on the sentencing enhancements that were applied in this case and the basis that the court used to apply them, which I think were not supported by the record. The first and most important, I think, is the cross-reference, as it's referred to, and that is and requires a finding of some form of criminal sexual abuse in order to be applied. And simply put, that requires that someone be caused to have commercial sex by force or threat of force or fear. Now, if we look at the four prostitutes, the four named prostitutes that were involved in this case with the defendant, there is no evidence that he ever coerced any of the four to have commercial sex out of force or fear. All of these women were experienced prostitutes when they met him, went on to prostitution after they left him, voluntarily came to him, and voluntarily left. Didn't Klempner testify she didn't have a choice about whether she could or could not work? Klempner's association with the defendant was very limited, but the quote which Your Honor refers to has to be looked at in context. First of all, she was picked up in Harrisburg, taken to Toledo, where nothing happened. She goes to Florida. They go out on an escort service a couple of times. No sex takes place. They come back to Harrisburg where she goes out one time at the Gables Lot and immediately then is recruited by Wayne Banks. She works for Wayne Banks for a while. Then she comes back after Banks is arrested and comes back with the defendant. Now, at that time, there's a lot of frantic discussions amongst co-defendants that Klempner, who had worked for a number of the co-defendants and for which there is a material witness warrant out, somehow be kept from authorities, and they were trying to prevail upon my client, Mr. Williams, since he had contact with her, to keep her away from the authorities. He never agreed to do that. In fact, the last thing that they wanted him to do was to take her to Harrisburg and attempt to work her because that would expose her to arrest and potentially detainment on the material witness warrant. But that's exactly what he does. He totally ignores what his co-defendants are telling him, brings her to Harrisburg, and the reason they came to Harrisburg was to try to escape the material witness warrant, at least in her eyes, so she doesn't want to go on the lot that night because she's afraid of being arrested. It has nothing to do with commercial sex. And that is acknowledged even in the government's brief, that her whole reluctance and her expressed reluctance on that occasion was, I didn't want to go out because of the police. It was because of the police. And that's exactly what the quote was. That's exactly the context it was in. And it had nothing to do with any reluctance to have commercial sex, which she had done willingly in the past. What about her, I'm not sure, I understand that argument, but I'm not sure that addresses her testimony that she didn't have a choice. On that particular record. And I think that's 525 and 526 of the appendix. If you could explain why that testimony does not support the notion of coercion. She said, she was asked at trial, did you want to go to work that night? She said, I was scared because of the police. I really didn't want to go because of the police. Well, why did you get ready to go to work? Well, I really didn't have a choice. You didn't have a choice? No, not really. And that's something that Terry said to you. No, I just didn't want to go through the problems of me not going. You don't want us to look at the Madison case, do you? Sure. Because the Madison case would say that there's no proof, you don't need proof that he forced her into a particular sex act that night. Right. And I'm familiar with the Madison case, and what the Madison case does say is that the force must at least be used to keep women in your employ. And are you suggesting that evidence is not in this case? I am suggesting that. The beatings, the belts, all this? If you understand this prostitution business the way it was described by Banks, it's a game, okay? It's a game that the women can enter or leave. But once you agree, once you step on that playing field, you might get hit and you might get hurt. But you can leave the game any time you want. But if you want to stay in the game, then you have to submit to discipline. And the discipline can be for an infraction of rules having nothing to do with having commercial sex. That they agreed to do. Or it could involve not having commercial sex, right? I mean, it's pretty obvious that if any of these women decided they were just going to take three days off and go to the beach, I mean, that's not going to work with the pimp partners. You have to leave the game or stay in the game. All of them. And so that's not coercion? No, no. So in Florida, you know, a 16-year-old in Florida can just say, oh, I'm going to leave. Well, how is she going to get back to Toledo? I mean, she can't even drive. Wayne Banks, well, if you're talking about Jessica Klempner, she was fired by Wayne Banks. Okay? And that, I think, the notion that a person can be fired from the prostitution business I think undercuts the entire notion that there is anything involuntary about their sexual services. The worst discipline you can impose upon a prostitute. How many Angelas slamming her into the car, the beating with the belt, took her a month and a half, the prostitute took a month and a half to recover, he wouldn't let her go to the hospital. Let's talk about that. Yeah, let's. Yes. Rachel Gomez, the beating with the belt. Now, here's a woman who had already prostituted with another co-defendant, Robert Scott. When Robert Scott is arrested, she comes to work voluntarily for Terrence Williams, works for him for a couple of weeks and takes a couple of what apparently is a normal family, a mother and a father and so forth. She thinks the atmosphere there is too strict. She comes back out to work for my client without any repercussions whatsoever, not punished for leaving or anything of that nature. Works for him for a period of time, then what she does, her rule infraction is to associate with another pimp, in this case Franklin Robinson. She goes to a party with him and they may have engaged in sex. It's hard to tell. But in the rules as outlined by Wayne Banks, a woman who's in the game does not look at another pimp. She did more than look. She actually associated with this person in some fashion. This is why she got punished. She came back and she was hit with a belt. What does she do then? She stays with him willingly for another month. After having a history that she could leave at any time and go home, if that's what she elected to do. But she didn't. She chose to stay in the game knowing what the consequences are and knowing and having, I see my time is up, that she could leave at any point because she had done it in the past. You're quite right. I think the record shows that there is sort of a perverse codependency. I mean, there is certainly an element, I think, of choice here. But the fact that some of these women, or even most of them, might come back, et cetera, or continue these very destructive relationships, it doesn't eliminate, does it, the coercive aspect. I mean, it strikes me as a combination. Why isn't it? It is perverse. But the question is, does it satisfy the requirements of the guidelines? Speak generically. I mean, where would most of these women go if they left? They came from nowhere. Many of them had no families, no one. So they could leave, but where would they go? I can speak to the four that my client was associated with. Jessica Klentner's mother was handing her up. I mean, she's going to go back to Mama? I don't think there was evidence that Jessica's mother was handing her out. Her mother was taking money. Again, this is a statement that was made by the government for which there was really no support. Well, we've got the five-page transcript, the wiretap, of the five co-conspirators, five of the co-conspirators, sitting together talking about what's going to happen so that Jessica doesn't testify in the grand jury in Northern District. That is what the government, how they construed what happened there. That isn't what happened. What happened there is that Wayne Banks is now under arrest. They know that Jessica Klentner is out there floating around, and she could offer testimony not only against Tim, but Frank Robinson, Derek Mays, Shimon Maxwell, as well as my client. Wayne Banks has never met my client, has no rapport with him, and is trying to persuade some of the other people to intervene and persuade Williams that there's a real threat here. And the problem is he just doesn't buy it. He doesn't see the threat. The last thing they want him to do is to bring Klentner to Harrisburg and try to work it, which is exactly what he does. This is what undercuts the government's assertion that there's some kind of conspiracy involving my client. They wanted him to do something. They wanted him to funnel money to the mother, which nobody trusted him to handle anyway, but it never happened.  Thank you. Thank you. May it please the Court, my name's Ted Smith. I'm a Special Assistant United States Attorney for the Middle District of Pennsylvania, representing the United States. The appellee here at council table with me is Gordon Zubrod, from whom you heard last week, who tried this case. You know, when I hear the presiding judge say that that sounds – that seems to me to be a good issue. I think that causes a little disquiet to me, so I'd like to address the issue. That was the point of the presiding judge making that comment. Exactly. And you gave me a little bit of chance to prepare. And it's something I thought about yesterday and last week as I prepared for this argument. First of all, if it is a problem that the court instructed the jury, as it did on count eight, it is a problem that affects only the maximum penalty. A 45-year sentence was imposed. It would reduce the maximum to 40 years, and presumptively, I would think that the only relief the defendant would be entitled to would be a decrease of a sentence to 40 years. Secondly, I think that there was no plain error here, okay? And I'm thinking about this court's perhaps seminal case. Of course, Olano is the seminal case on plain error, but this court's seminal case on it is a case called the United States v. Noblock. And in Noblock, it was a guilty plea case, but the court absolutely misinstructed the defendant on the elements of the offense to which he was pleading guilty. It was one of these old 924C counts, and the judge said that what the government would be required to prove is that you carried or used the firearm during and or in relation to a drug trafficking crime. And, of course, it was absolutely necessary that he carry the gun during and in relation to a drug trafficking crime. The judge's instruction to the defendant of what he was pleading guilty to pretty much made it unnecessary for the government to prove the nexus between the gun and the drug crime. Nevertheless, this court held that there was no plain error. It wasn't raised. See, that's why I suggested earlier, it would be very difficult for me to find plain error as to the conviction part of the misinstruction, which you failed to put the second part in. But I'm more concerned about the sentencing exposure and what I see would characterize shorthand as the apprendee error here, because you've got an indictment which frames the elements of Count 8 in the conjunctive, not the disjunctive, and thus diverges from the statute, and the court's instructions, which both deal with the disjunctive. Then you've got the verdict sheet. I'll go back to that in just a moment, where all there was no special interrogatory. The court would misspoke when she said that at sentencing. Or it asked whether the defendant was guilty or not guilty of the crime charged in Count 8 of the indictment, referring you to the superseding indictment, which spoke in the conjunctive. And then at sentencing, the court said that essentially the apprendee issue was submitted to the jury in a special interrogatory, which it wasn't. So I find it very difficult to say that we know what the jury did beyond a maximum sentencing here is 40 years or life. Correct? That's my argument. What, Mr. Smith, in your view, did the verdict sheet ask the jury to find? Well, as to Count 8, it asked the jury to find guilty or not guilty of a count of an indictment which did correctly charge the offense. Now, what did it say in the verdict sheet? It was, well, the verdict sheet on Count 8 was guilty. No. No. I mean, what was the question? Would it require the jury to find? What did it require the jury to find? It did not require the jury to make a special finding as to, on Count 8, as to which element. Let me now be very specific. The verdict slip for Count 8, you tell us in your brief, required the jury to find defendant guilty of sex trafficking of children by force, fraud, or coercion of Jessica, as alleged in Count 8. That's what you tell us in the brief. But the verdict sheet has an or in it that you have not told us is in it. It alleged the jury is required to find defendant guilty of sex trafficking of children or by force, fraud, or coercion of Jessica. That's a big difference. That's two different offenses. Well, Your Honor, I mean we don't know what they found him guilty of. We don't know which of those offenses, for purposes of sentencing, the jury found beyond a reasonable doubt he committed. Yet they did return, as to Count 1, a finding. Count 1 was not the crime charged in Count 8 of the indictment. That was coercion enticement in Count 1 as to a different crime. But to deal with the or business, was that a mistake in your brief? Yes, apparently. Page 68. If you could turn to page 68 and page 69 of your brief. I have the same concern as Judge Berry. When I look at page 6, the quotation that she just read, which appears at 68 and 69, and then I look at the appendix at page 1888, I see two radically different things, and they're almost identical, but one has the word or and the other doesn't, which is precisely what makes them radically different. I thought on page 68 to 69 I did, in fact, use the disjunctive or. No. And then I dropped the footnote. Can you read it from the brief, what it says? Maybe I'm misreading the brief. A review of the verdict slip, however, belies defendant's claim. The verdict slip for Count 8 required the jury to find defendant guilty of sex trafficking of children by force, fraud, or coercion of JK. All right. So children by force, right? Children by force. Children by force, right? But the or is missing after the word children. And then appendix 1888. Okay. You see? Can you take a look at appendix 1888 if you happen to have it? I'm not sure I brought that part of the appendix. Here. I have it right here, Mr. Smith. I mean, it's an important point here. Clearly, I made a --" I'm sure it wasn't. If there is an inconsistency between what I quoted, which was incomplete, apparently --" Give this to Mr. Smith. I don't want him to be. Please. It's a little marked up, but. Thanks, Michael. On the charge of sex trafficking of children or by force, fraud, or coercion. And we appreciate the significance of the difference between those two, do you not? No. I do. Okay. And I just, because I'm a little concerned that the Court thinks maybe I'm just trying to pull the wool over its eyes. I sort of drew the Court's attention to this in footnote 3 on page 69. So because I'm not the difference between the verdict slip, but the difference between the instructions that the Court gave and the instructions the Court should have given on that. And the argument I made was that you do know what the jury found, because there was just an enormous amount of evidence of coercion here. Well, that's the evidential point. I mean. And again. Just because the evidence is sufficient to show coercion, and I think you're getting the correct vibrations that at least a couple of us in the panel may agree with you on that. But that begs the question. They still could have chosen the other path to convict. Just because the evidence is sufficient on path B doesn't mean the jury didn't choose to convict on path A, which would necessitate a remand under Apprendi, would it not? Well, no, because the issue wasn't objected to. You're back to your plain error issue. You're back to your plain error. I go back to plain error. And I think if it's not plain error. The difference is a difference between a 40-year maximum and a 40-year sentence and the 45-year sentence that was imposed. It does make a difference. His substantial rights were very seriously affected by this error, if error it be. Well. But we're using your whole time on this issue. Well, this clearly is the issue that concerns the court. So I think it's very appropriate to use all. It's not my time. It's the court's time. And I want to satisfy the court that there's no plain error here. Why under Knobloch? I mean, in Knobloch, I don't remember the details of Knobloch. But in that case, would the defendant be exposed to two different statutory maximum sentences? He'd be not guilty. He'd be not guilty. But he's pleading guilty. He's saying he's guilty, so. Yeah, but he's saying he's guilty of something that's been misdescribed. And the court in Knobloch said that what the defendant had to show there, to show plain error, was that he would have pleaded differently but for the error. And I know that's different than here. But I think what the defendant has to show here is that the verdict would have been different, okay? I don't think the mere difference of the five years in the sentencing establishes that his substantial rights were affected. I think, remembering that plain error is the burdens on the defendant to show plain error, he has to show that the verdict would have been different. Well, of course, Apprendi says the indictment, you have to look at the indictment and the verdict, and we have an off we have inconsistencies here. I mean, you've got the conjunctive in the indictment. You've got the disjunctive. It's not that the verdict would have been different because the verdict, let's posit that the verdict is guilty because you have the defendant coming and going, so to speak, right? You've got plenty of evidence on either side of the oar. The problem is we cannot, it's impossible for us to know which path the jury took. I think, and this goes, two things I want to respond to, and I'll respond to this one first. For example, let me just add one other tweet. If there was no evidence of age put into the case, then I think we would have to accept your argument because we must conclude the jury chose the coercion path. But here we've got ample evidence of age. We've got ample evidence of coercion. We can't know which path the jury chose to convict. The jury may have chosen both paths for all we know. Well, okay. And the question the Court asked, I think both Judge Barry and you, Judge Hardiman, said is the mere fact that the evidence is sufficient to show coercion, does that mean that there's no plain error? And my answer to that question is no. Mere sufficiency is not enough to negate the possibility of plain error. But this is not a case of merely sufficient evidence to show coercion. The jury was not properly charged on the elements which would control the penalty, either. I mean, there are just too many things, I think, here to enable us to say with confidence that the jury found beyond a reasonable doubt that the maximum penalty here could be life. Of course, they didn't know what the stakes were. No, no, I understand that. Yeah. And perhaps that's a problem, too. Let me go back, though. That is a problem. But they don't have to be told that. But they have to be properly charged, and they have to have not inconsistent documents before them on which to make their decision at the end of the day. Well, I want to talk about the inconsistent documents also because, I mean, the problem there is that we always charge – Wouldn't you rather talk about vulnerable victim and things like that? Are you happy to be here where really at the end of the day – No, I'm not. You're causing me a great deal of discomfort, Your Honor. What's the worst that could happen here? Let's cut to the chase. You've quite, you know, properly and candidly conceded the case needs to go back on the merger issue. We're going to have a resentencing here. We know that. It absolutely has to go back on the merger issue. All right. So, you know, we can't get you to concede that part of the resentencing should also involve this issue regarding – that we've been spending so much time on? Well, you're asking me to concede that five years should be taken off the sentence. And, frankly, if that's all that happens in this case, I'm not sure the Republic will fall. On the other hand, I think this guy deserved every minute of time that the court gave him. And I don't want to concede that the court shouldn't have given it to him because I think – But we can't know. Under Apprendi, we can't know because of the error. Well, except – I think he was going to concede it was error. Here's where I go to count one. Well, that's a good point, Judge Hartley. Excuse me? Because if he's talking plain error, he has to concede that there was error. There was error. Yeah. Well, there's no question that there was an error in the instruction. And why – It wasn't detected. It's plain in the sense that it's clear error. But so you've got to fight the battleground on doesn't affect substantial rights. Well, five years off a guy's sentence is substantial. I agree. I wouldn't want to have to do that five years myself. All right. So now the last thing you're left arguing is that the records so clearly showed that there was no prejudice, that there was coercion. Absolutely. But the record also showed she was under 18. But the jury found – and here's where, Judge Barry, you stopped me on this, and I wanted to articulate it. On count one, the jury did make a special finding. But it's a different kind of – Well, it was coercion or enticement. It was coercion or enticement. But again – But they don't tell you in the verdict – didn't tell the jury in the verdict sheet to go to count one for the definition. It told them to look at count – But the jury – The jury could have convicted on enticement on count one, correct? Yes. Okay. And count eight doesn't say enticement. But again – It says forced fraud or coercion, and all three of those are a higher level of compulsion than enticement. But the evidence of coercion, again, was so strong that I think the court can be satisfied with confidence that the jury didn't do that and that the jury found there to have been coercion because of the beating with the metal end of the belt and the shoving against the steering wheel and breaking ribs and the shoving her head into the windshield and, you know, everything that Jessica Klempner testified to. The one woman – I don't remember their initials very well, and I've been training myself to only use the initials. The woman who was raped by the truck driver and was still told she had to go back out on the lot – Rachel, yeah. And prostitute herself and who didn't – you know, who knew what would happen. She said she was worried about what would happen if she didn't do that, and she had been beaten. So I think there is just overwhelming evidence of coercion here. And since there is overwhelming evidence of coercion here, you don't have plain error. You don't have – Well, I – that's your argument. That's my argument. The jury was referred to count eight of the indictment, which charges in the conjunct of doing no beyond a reasonable doubt the jury found both here. No, and I do want to talk about that because Your Honor keeps mentioning it. The law – and it's not an issue that was raised in the brief, so I can't cite a case. The law is pretty clear. We must charge in the conjunctive. If we fail to charge in the conjunctive, we may create a – either a duplicitous or a multiplicitous indictment. Therefore, we must charge in the conjunctive, but the Federal law has always been that we may prove in the disjunctive. Okay? So, see, that's the problem for the jury because you charged in the conjunctive, but they were charged in the disjunctive, so we really don't know what they found. And I remember when I had the same job you had a thousand years ago, we used to argue – we called in the old days the Gimmelstab line of cases. I understand what you have to charge, but none of this stuff is very clear to the jury. Given the failures here in the instructions and the inconsistencies between the indictment, the verdict sheet, and the instruction and the statute. I would think that if – really, if you wanted to try – if we wanted to read the tea leaves and try to figure out what the jury did, I would think that looking at the indictment, they would have thought that they had to find both. They're always instructed on the disjunctive, so I don't think that creates any additional problem here. The only problem is that the disjunctive they were instructed on here should not have been a disjunctive. You know, and so I understand there's error. I again say, because of the overwhelming evidence of force and coercion here, that there's no plain error affecting substantial rights because it's up to the defendant to demonstrate that the verdict would have been different but for the error. That's my argument. Before you sit down, Mr. Smith, can you just address an issue that's caused me a lot of thought and perhaps some confusion regarding vulnerable victim? I mean, if we follow Sabatino, did the district court err in finding vulnerable victim here? And the larger question I'm wrestling with is, you know, what is the standard in a Mann Act case? Because on one level, you could say the great majority of women caught up in a Mann Act conspiracy are, quote, vulnerable. But it stands to reason that under the guideline definition of a vulnerable victim, that's going to have to be a much higher threshold than other cases, right? Well, let me say I don't completely agree with you. And the reason is that guidelines are not statute specific. There are many instances in which an enhancement automatically applies under the guideline that's applicable to the offense because the offense involved an element that triggers that enhancement. And I think that is one thing that Your Honor is concerned with here. But that's not a problem under the guidelines because the guideline that you apply will apply to a number of different statutory violations. And so you, it's not double counting because the guideline is broader than the statute. And the fact that that element of vulnerable victim is in the statutory violation, that's not true for every statute covered by that guideline. So I think that's not a problem. But in Sabatino, the First Circuit said that there's a much higher, they put the government to a much higher test in a Mann Act case to show vulnerable victim. Well, okay. Should we follow that? Well, first of all, I don't think you should follow it for the reason I just articulated. But perhaps more importantly, I think these victims were beyond the level of vulnerability that exists even in your average Mann Act case because of the specific characteristics. We heard that four of them who were actually examined by the psychologist, Dr. Cooper, had some pretty, pretty. And that didn't come into trial, though. That was in the Daubert hearing. That was evidence at the Daubert hearing, but the district judge kept it out for trial, the effect on the individual victims in this case. The judge was entitled to consider it for sentencing, though. Yeah, okay. And it was alluded to in the pre-sentence report. And the only objection to the vulnerable victim and the number of vulnerable victims enhancements was not that there weren't any vulnerable victims. It was that the girls he was involved with were not vulnerable victims. Now, I disagree with that. I can't think, I can't imagine anybody more vulnerable than J.K., whose mother was quite willing, we think, to, or certainly he thought, was willing to pimp her own daughter. And the defendants, the testimony, the record is rife with testimony that these people looked for vulnerable girls. They looked for girls from broken homes. They looked for girls who had nowhere to go. They looked for girls who the district judge just didn't make findings. I mean, that's one of the, there are these broad brush references to, well, there are a lot of girls and they're all vulnerable. She didn't mention J.K. by name in this particular sentencing. But it would have been a lot more helpful, for me anyway, had the district court gone through and made some specific findings. I know it was a grueling trial. But I, and I think all I can do, coming to the district judge's defense here, is suggest that the court is going to rule on the objections as they are presented to it. And the objection here on vulnerable victim was not that none of these victims were vulnerable. It was a, the objection was simply Mr. Williams was not involved with any of the, none of the women with Mr., with whom Mr. Williams was involved was vulnerable. The judge addressed that by saying Jessica Klempner was. Okay? And I think that pretty much took care of that objection. So while we might. Kagan. I think she also went into the conspiracy then, the foreseeable. And that's the other question, is it doesn't matter whether the girls he was involved with were vulnerable, because under Pinkerton and the relevant conduct rules, he's responsible for the foreseeable conduct of his co-conspirators. I bet you thought I was going to beat up on you on organizer-leader after our argument of last week. I did not. Probation still got it wrong in the pre-sentence report. Yes, she did. But I think she made it at the sentencing. She did get it wrong. But the fact is that he was an organizer-leader at the very least of the cover-up efforts. Well, let me just ask you, just who specifically did he organize or lead? I mean, how much training did he give Smith, Jr.? Scott, Jr. Scott, Jr. Scott II. Yeah. He, considerable amount, I think. And, but I also think. But at least you had five participants. Absolutely. That she mentioned. Absolutely. But I also think he was the, he absolutely was the organizer or the leader of the efforts to get Jessica Klempner away from law enforcement. Well, Banks didn't help him when he's quoted on the call saying, and you know, it's all my call. Yeah. And Banks described him as a middleman. I thought you'd be, you'd be pleased. Now, with all due respect to Mr. Williams's superb attorney's argument in this regard, at least this time I'm not going to beat up on you on this issue. Well, and this, this is my swan song, Your Honor, so if you want to beat up on me, you better do it now. What, your swan song? I left the U.S. Attorney's Office and I'm, I'm a, I'm part of the problem, not part of the solution. I'm a bureaucrat down in Washington now for the department. Oh. And I'm only up here as a special assistant. So, you know, have at it if you want to beat up on me. I wondered when you, when you introduced yourself. Do you want to do a, have a Nixon moment that we won't have poor Ted Smith around anymore? You know, I've never, I'll say this, and then I'll sit down. I don't want to be a sound obsequious, but this court doesn't beat up on attorneys. This is a collegial court. It's always a challenge, an intellectual challenge. But I never leave here not thinking it was thoroughly fun. And so, and I never leave here feeling that I haven't gotten a good working over. So I appreciate it. I don't think we've done very much to him. We can do a little more. I don't want to disappoint you. I agree. Mr. Zubrod's trying to say, shut up, Smith. Just shut up. Well, much good luck to you, Mr. Smith. Thank you. You've done a wonderful job over the years. I see your name on brief after brief and your arguments have been excellent. Thank you very much, Your Honor. Much good luck to you. Thank you. All right. Back to you, Mr. O'Connell. And we've given Mr. Smith extra time, so feel free to use what you think you need, within reason. Thank you. I would like to point out to the court something that has not been specifically mentioned here, and that is the liability under the guidelines and their enhancements of my client for acts of co-conspirators. I believe it was incorrectly stated by Mr. Smith that simply because they are co-conspirators that he may be liable for their acts as they relate to the enhancements in the guidelines. I believe 1B1.3 directly contradicts that. It says in the notes, it is important to note that the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy. It says that jointly undertaken criminal activity is not necessarily the same as the scope of the entire conspiracy. Only the reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity can be attributed to my client. We knew it had to be reasonably foreseeable. I don't think he indicated otherwise. We were here last week on this case, too, and a substantial amount of the discussion involved what was reasonably foreseeable and what wasn't. I would just point out that there was only two defendants who went to trial in this case, jointly mine and a person by the name of Eric Hayes. The facts in Eric Hayes' case were significantly, I think, more serious in terms of violence than the facts in my client's case, but bear in mind that these two operated independently, had never met until the day of trial, and I think it would be grossly unfair to attribute to my client acts done by that particular co-defendant and others that he had never met, of which there were numerous in this organization. I think he should be, what should be attributed to him is only the things that he directly participated in, either himself or with others, and I think in this case a fair way to look at that are the four prostitutes that he was involved in. And one last thought that I would like to convey to this court is that the notion of the infliction of violence for some other purpose in conjunction with prostitution, other than causing a woman to have sex, I think does not meet the guidelines. I know I'm encountering a great deal of resistance, and perhaps I'm cutting too fine a point here, but I think that's a different thing. Well, I understand. You're saying that if a pimp beats terribly a prostitute because he's jealous because she's sleeping with one of the pimp partners, that's not covered by the guidelines. That's not true. But if he beats her because she's not working hard enough to earn for him, then it is covered. Is that the argument you're making? Yeah, I think that's fairly close. There could be a variety of reasons why a pimp might beat a prostitute that's not covered by the guideline. Yeah, and I think that as long as you consider that distinction, I'm fine, just as long as it's understood, because I think it's an important one here. And I think not just every act of violence in the course of prostitution is covered by the guideline. It has to be a very specific kind of force used for a specific kind of purpose. And, again, the notion that you can walk away from the game whenever you want, I think, adds another element. And I don't think the force or fear of coercion is merely the fear of having to enter your prior life before it was your life of prostitution. It's got to be some other kind of fear. What about vulnerable victim? Would you address Sabatino and that issue relative to Man Act cases? Yes. I think the word that has been omitted in the discussion between the court and the opposing counsel is that it has to be unusually vulnerable, not merely vulnerable. And that's what we don't have. Mere economic deprival, homelessness, drug dependency, those elements do not seem to be sufficient. And I'm not even sure those elements were present here, in any case. What finding did the trial court make in that regard to support that enhancement? Specifically. I mean, I guess to help you a little, my notes indicate that she found that Jessica Klemner was, quote, unusually vulnerable due to her emotional and economic state. Why was that an abuse of discretion to make that finding? I don't know what her emotional state was or what evidence there was of her emotional state. And her economic state didn't seem to be particularly unusual. I'm not sure how that was. Well, she was thrown out by Robinson, left with nothing. I mean, her mother's. That's. I'm glad you brought that up. Specifically, the court said Jessica Klemner was emotionally vulnerable, having left home voluntarily, at first with Frank Robinson, but later separated from her family, dumped in Detroit by Robinson, left alone penniless and without means of support or resources available to return her home to her former life. Now, our case law says, Kennedy, the Kennedy case from 2009, victims can be particularly vulnerable if they are financially insecure, sick, in a state of emergency, or otherwise susceptible to the particular kind of criminal conduct at issue. Wouldn't you think that would cover the Jessica Klemner case? It might if anything that the court said was factually correct, which it is not. The facts in the case were that she was left home voluntarily, not with Frank Robinson, but because she was on the street and was ultimately picked up by a person by the name of Shimon Maxwell and prostituted for him, then went to Frank Robinson, and she was not dumped in Detroit, but taken by Robinson to Harrisburg to the Gables truck lot, where she was then associated with Derrick Mays. Derrick Mays discovered and confirmed that she was in fact a minor, wanted to get her back to Toledo so she could be home, called his friend, Terrence Williams, my client who happened to be in Toledo, and said,  There was no discussion as to what he would do with her or what they would decide to do ultimately. He came down, stayed one night, picked her up, took her back to Toledo where she had any opportunity, if she wanted to exercise it, to go back home. She elected not to, stayed with my client, and he went to Florida. That's what I have to say about the court's justification for a vulnerable victim. Thank you. Well, I think we should probably applaud Mr. O'Connell, too, because I guess you've been in this case for a very long time, and you've done a very, very good job for your client. You both have done, well, three of you have done very good jobs for your clients. We've had a bunch of these cases. You've had this one, and I'm sure you're tired. All right. We'll take the case under advisement. The clerk will adjourn court. I'd like to see my law clerks at the sidebar, please. Thank you. See you later. Take care.